[Cite as *Aubry v. Univ. of Toledo, Med. Ctr.*, 2010-Ohio-3747.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us



LAWRENCE AUBRY, et al.

    Plaintiffs

    v.

THE UNIVERSITY OF TOLEDO MEDICAL CENTER f/k/a MEDICAL UNIVERSITY OF OHIO AT TOLEDO

    Defendant
    Case No. 2007-05814

Judge Clark B. Weaver Sr.

<u>DECISION</u>


{¶ 1}  Plaintiff, Lawrence Aubry,[1] brought this action against defendant, The University of Toledo Medical Center (UTMC), alleging a claim of medical malpractice. Plaintiff's wife asserted a claim for loss of consortium.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}  Plaintiff testified that he has experienced difficulty with urination since the 1980s and that he has undergone several urological procedures in an effort to relieve his symptoms, which include urinary frequency and difficulty emptying his bladder. Plaintiff had a transurethral resection of the prostate gland (TURP), performed in 1987, and again in 1989, with some improvement in his condition.  Then in the 1990s, his condition worsened and he sought treatment from G. Mark Seal, M.D., at UTMC. Initially, plaintiff took medication in an effort to shrink the prostate gland which helped to alleviate his symptoms temporarily.  In 2005, plaintiff again complained to Dr. Seal that

he was awakened several times during the night to urinate and that he experienced frequency and urgency along with the feeling that his bladder was not being emptied. Plaintiff testified that Dr. Seal suggested in 2006 that plaintiff undergo a "green-light" laser procedure to eliminate excess prostatic tissue.

{¶ 3} According to plaintiff, the surgery was performed at UTMC on June 19, 2006, and that postoperatively he experienced significant pain, bleeding, and urinary incontinence. Plaintiff testified that within a very short period of time after the laser procedure he was totally incontinent of urine, soaking through numerous adult disposable pads per day. Plaintiff recalled that at a follow-up appointment in July 2006, Dr. Seal was at a loss to explain what was causing plaintiff to experience pain and incontinence; however, Dr. Seal insisted that the laser procedure did not cause the problem. Plaintiff testified that one or two months after the laser surgery, he had obtained his records from Dr. Seal and at that time he learned that the laser procedure had not been performed by Dr. Seal, but by Dr. Ranko Miocinovic, a third-year resident at UTMC.

{¶ 4} Plaintiff consulted with another urologist, Dr. Murtagh, who performed extensive urological tests, and who subsequently informed plaintiff that his incontinence could be resolved only by surgical implantation of an artificial sphincter. The device included a cuff which, when placed around the urethra, could be deflated to allow urine to be released from the bladder; upon the emptying of the bladder, the cuff could be re-inflated manually via a pump located in the scrotum and connected to a water reservoir implanted near the bladder. Plaintiff testified that he was hesitant to accept the solution offered by Dr. Murtagh and that he sought another opinion from a urologist at The Ohio State University Medical Center, Dr. Gilleran. Dr. Gilleran confirmed that an artificial sphincter was the only way to control plaintiff's incontinence. Plaintiff had a third consultation with Dr. Ariss who also recommended the artificial sphincter. Plaintiff stated that Dr. Murtagh implanted the artificial sphincter in November 2006.

{¶ 5} In his complaint, plaintiff alleges that Dr. Miocinovic was negligent in that he performed an unnecessary procedure and that he performed the procedure negligently, which caused permanent injury to plaintiff's sphincter.

---

[1]Throughout this decision, "plaintiff" shall refer to Lawrence Aubry.

{¶ 6} Defendant denies liability arguing both that the laser procedure was done correctly and that it was not the cause of plaintiff's incontinence. Rather, defendant posits that, although plaintiff was continent prior to the laser procedure, his anatomical continence mechanisms had been compromised as a result of the two previous TURPs and another surgery to correct spinal stenosis. Defendant asserts that scar tissue at the neck of plaintiff's bladder and at the area of the prior TURPs had kept plaintiff continent, but that once the scar tissue was removed in an attempt to alleviate his symptoms, plaintiff became incontinent. In addition, defendant argues that the performance of the laser procedure for the removal of scar tissue from the neck of the bladder or from the prostatic urethra was within the standard of care and that such procedure was indicated due to plaintiff's history and complaints of ongoing discomfort.

{¶ 7} In order to prevail on a claim of medical malpractice or professional negligence, plaintiffs must first prove: 1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise* (1999), 133 Ohio App.3d 564; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127. The appropriate standard of care must be proven by expert testimony. *Bruni* at 130. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. Id.

{¶ 8} Plaintiffs presented the expert testimony of Dr. Michael Hallet, a physician who is board-certified in urology.[2] Dr. Hallet testified that his clinical practice is almost completely composed of adult urology patients and that he has performed green-light laser procedures on many patients experiencing obstructive symptoms such as straining, slow flow, intermittent stream, and incomplete emptying of the bladder. Dr. Hallet explained that the male urinary system has three continence mechanisms that control the release of urine: the internal sphincter at the neck of the bladder, the prostatic urethra (the portion of the male urethra that is surrounded by the prostate gland), and the external sphincter which lies below the prostate and immediately below a small mound of tissue known as the veru montanum. According to Dr. Hallet, the external sphincter is the most important continence component and the veru montanum

is used by urologists as the anatomical landmark that signals the proximity of the external sphincter.

{¶ 9}  To treat obstructive symptoms, Dr. Hallet stated that the urologist inserts a scope through the urethra into the bladder.  A tiny camera and laser are then guided through a sheath and the laser is threaded into the bladder.  After viewing the bladder for any signs of disease, the laser is slowly drawn back and, upon visualization, the laser is triggered to burn away or vaporize excess tissue at the internal sphincter in an effort to widen the opening and thus improve the flow of urine.   Dr. Hallet further explained that the laser is controlled by a foot pedal, and that while more than one person can view the images depicted by the camera, the ablation of tissue can be performed only by the operator of the laser.  After reaching the prostatic urethra, the laser operator then removes any excess prostatic tissue that may also be inhibiting the flow of urine.  According to Dr. Hallet, the urologist opens up the internal sphincter and the prostatic urethra and leaves the external sphincter alone.  Dr. Hallet related that the laser operator must continuously monitor the anatomy while withdrawing the device from the urethra to ensure precision with the laser.  Once the device has been retracted below the prostate, the operator looks for the veru montanum inasmuch as it signals to the operator that the external sphincter is the next anatomical landmark to be encountered.  According to Dr. Hallet, the operator should not engage the laser once the veru montanum is located.  Dr. Hallet testified that if the laser were to be engaged at that point, the operator could obliterate the external sphincter in a matter of seconds. Dr. Hallet warned that once the external sphincter is damaged, there is no biological mechanism remaining to halt the flow of urine from the bladder.

{¶ 10} After reviewing the medical records from plaintiff's treating physicians, including Drs. Seal, Murtagh, Gilleran, and Ariss, Dr. Hallet opined that Dr. Miocinovic negligently performed the green-light laser procedure, that he deviated from the standard of care, and that as a direct result of Dr. Miocinovic's deviation from the standard of care, plaintiff was rendered completely incontinent.   Dr. Hallet explained that the lower lobes of the prostate gland, the veru montanum, and the external sphincter are mere millimeters apart and that in all probability, Dr. Miocinovic allowed

_____

[2]Upon review, the court finds that Dr. Hallet is qualified to offer expert medical testimony in this

the laser to drift away from the lower edge of the prostate and inadvertently ablated the external sphincter. Dr. Hallet opined that Dr. Miocinovic's performance in ablating a portion of the external sphincter with the laser fell below the standard of care. Upon cross-examination, Dr. Hallet reiterated his opinion that, to a reasonable degree of medical certainty, the injury to the external sphincter was caused by the laser. Dr. Hallet based his opinion, in part, upon the fact that plaintiff was continent before the procedure and that during his post-procedure examination of plaintiff, Dr. Murtagh noted that plaintiff's external sphincter was completely wide open and that plaintiff could not squeeze it closed.

{¶ 11} In addition, Dr. Hallet opined that the green-light laser procedure was not the appropriate treatment for plaintiff inasmuch as plaintiff suffered from irritative symptoms rather than obstructive symptoms. He explained that although plaintiff complained of frequency and urgency at night and felt as if his bladder was not emptying, urologic testing confirmed that he was able to completely empty his bladder. Thus, Dr. Hallet opined that plaintiff's symptoms were not the result of some obstruction to the flow of urine. As such, Dr. Hallet opined that Dr. Seal's treatment of plaintiff fell below the standard of care in that he recommended plaintiff undergo a laser procedure which was not appropriate to treat plaintiff's symptoms.

{¶ 12} Dr. Seal testified by deposition that he began treating plaintiff in 1996 for urinary obstructive symptoms and urinary tract infections. In 1999, he diagnosed plaintiff as having mild outflow obstruction. In 2002, Dr. Seal performed a cystoscopy to visualize plaintiff's urinary tract anatomy, which he then noted to be normal. Plaintiff returned to Dr. Seal's office in November 2005 complaining of nocturia in that plaintiff was arising four to six times per night feeling the urge to urinate. Thus, in December 2005, Dr. Seal performed another cystoscopy which revealed that plaintiff's bladder neck area was wide open, that he had mild regrowth of prostatic tissue, and that his bladder capacity was smaller than normal. Through testing, Dr. Seal also confirmed that plaintiff's bladder did not have large residuals of urine after voiding. According to Dr. Seal, he prescribed a combination of various medications in an effort to alleviate plaintiff's urinary complaints.

case, including the standard of care for residents.

{¶ 13} Dr. Seal testified that he treated plaintiff in February 2006 for a urinary tract infection and that in April 2006 plaintiff exhibited signs of a bacterial prostatic infection. Based upon these occurrences, Dr. Seal concluded that plaintiff's regrowth of prostatic tissue might be the cause of his discomfort and for that reason he recommended that plaintiff undergo the green-light laser procedure. Dr. Seal recalled that Dr. Miocinovic performed 100 percent of the laser procedure under Dr. Seal's direction and guidance. Dr. Seal related that during the procedure plaintiff was noted to have narrowing at the bladder neck and that the laser was applied to that area. In addition, excess prostatic tissue was identified and vaporized via the laser. Dr. Seal maintained that both he and Dr. Miocinovic then located the veru montanum and the external sphincter and, at that point, the laser was withdrawn and a catheter was inserted into plaintiff's bladder to facilitate post-procedure urinary drainage.

{¶ 14} Dr. Seal acknowledged that plaintiff experienced post-procedure incontinence; however, he attributed that to the deterioration of plaintiff's continence mechanisms overall rather than as a result of a mishap with the laser. In support of his position, Dr. Seal asserted that he did not observe the laser come into contact with plaintiff's external sphincter during the green-light procedure. In addition, he emphasized that when Dr. Murtagh visualized plaintiff's urethra, he did not note the presence of burns, strictures, or scar tissue at the site of the external sphincter, only that it was patent and that plaintiff could not voluntarily close it. Finally, Dr. Seal relied upon the fact that Dr. Murtagh did not record that plaintiff's veru montanum was absent, which in Dr. Seal's opinion would have been the case had the external sphincter been damaged by the laser.

{¶ 15} Dr. Miocinovic testified that he performed the green-light laser procedure under the direction of Dr. Seal, that he did not ablate the veru montanum or any portion of plaintiff's external sphincter, and that if he had done so, it would have been noted in the medical record which he dictated after the procedure.

{¶ 16} Defendant's expert urologist, Dr. Gianakopoulos, testified that urinary incontinence is a known risk of the green-light laser procedure, and that it is more likely to occur with each subsequent procedure in that the ablation of tissue disrupts the normal continence mechanisms which work in concert with each other. He opined that

leakage of urine can occur without injury to the external sphincter due to failure of the bladder neck and prostatic urethra mechanisms. According to Dr. Gianakopoulos, plaintiff was at risk for urinary leakage inasmuch as he had two prior TURPs before the green-light laser procedure. Dr. Gianakopoulos opined that Dr. Miocinovic met the standard of care based upon his dictated medical record which described that the appropriate landmarks were identified, and that he had avoided the area of the external sphincter. He further opined that the procedure was appropriate for plaintiff based upon his presenting symptoms.

{¶ 17} Dr. Gianakopoulos attributed plaintiff's urinary incontinence to the inability of plaintiff's external sphincter to control the outflow of urine after the removal of scar tissue at the bladder neck and the prostatic urethra. Nonetheless, upon cross-examination, Dr. Gianakopoulos acknowledged that he had never treated a patient who required an artificial sphincter after opening the bladder neck with a green-light laser.

{¶ 18} Upon review of the testimony and evidence adduced at trial, the court finds that it was not below the standard of care for Dr. Seal to recommend the green-light laser procedure as a treatment for plaintiff's symptoms. Nonetheless, the court finds that the care and treatment provided to plaintiff by Dr. Miocinovic, under the direction and supervision of Dr. Seal, fell below the accepted standard of care. Specifically, the court finds that plaintiff suffered an injury to his external sphincter as the result of a misapplication of the green-light laser and that such mishap caused plaintiff's incontinence. It is undisputed that plaintiff was continent of urine before the procedure and that, afterward, he was rendered completely incontinent, necessitating the implantation of an artificial sphincter. The court finds that Dr. Murtagh verified that the external sphincter was abnormal after the green-light laser procedure in that the sphincter was patent upon visualization, and he confirmed that plaintiff was unable to close the sphincter voluntarily. The court further finds that Dr. Hallet's testimony was quite candid and persuasive, and that he provided the most credible opinion as to the likely cause of plaintiff's incontinence. Although Drs. Seal, Miocinovic, and Gianakopoulos testified as to the risk of leakage after multiple ablative procedures, the court is convinced that such complication would not equate with the complete lack of urinary control experienced by plaintiff.

{¶ 19} For the foregoing reasons, the court finds that plaintiffs have proven by a preponderance of the evidence that  the care and treatment rendered to plaintiff that forms the basis of this action fell below the accepted standard of care.  Plaintiffs have proven by a preponderance of the evidence that they are entitled to relief and, accordingly, judgment shall be rendered in favor of plaintiffs.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LAWRENCE AUBRY, et al.

     Plaintiffs

     v.

THE UNIVERSITY OF TOLEDO MEDICAL CENTER f/k/a MEDICAL UNIVERSITY OF OHIO AT TOLEDO

     Defendant
     Case No. 2007-05814

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiffs.  The case will be set for trial on the issue of damages.

_____
CLARK B. WEAVER SR.
Judge

cc:

Brian M. Kneafsey Jr.                    Thomas W. Gallagher
Assistant Attorney General               400 Toledo Legal Building
150 East Gay Street, 18th Floor          416 North Erie Street
Columbus, Ohio 43215-3130                Toledo, Ohio 43604-5622

SJM/cmd
Filed July 21, 2010
To S.C. reporter August 11, 2010